******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PHILIP FILIPPELLI III ET AL. *v.* SAINT
MARY'S HOSPITAL ET AL.
(SC 19148)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Robinson and
Vertefeuille, Js.

*Argued December 2, 2014—officially released October 13, 2015*

*Stephanie Z. Roberge*, for the appellant (named plaintiff).

*Ellen M. Costello*, for the appellees (defendant Waterbury Orthopaedic Associates, P.C., et al.).

*Opinion*

PALMER, J. The plaintiff, Philip Filippelli III,[1] brought this medical malpractice action against the defendants, Dennis M. Rodin and Waterbury Orthopaedic Associates, P.C.,[2] claiming that Rodin negligently failed to timely diagnose and treat the plaintiff's compartment syndrome,[3] resulting in severe and permanent injuries to the plaintiff's lower left leg. Following a trial, the jury found that the defendants had not breached the standard of care and returned a verdict in favor of the defendants. The trial court rendered judgment in accordance with the jury verdict, and the plaintiff appealed to the Appellate Court, which affirmed the trial court's judgment. *Filippelli* v. *Saint Mary's Hospital*, 141 Conn. App. 594, 597, 61 A.3d 1198 (2013). On appeal to this court following our grant of certification; *Filippelli* v. *Saint Mary's Hospital*, 308 Conn. 947, 67 A.3d 289 (2013); the plaintiff claims that he is entitled to a new trial because the Appellate Court improperly concluded that the trial court did not abuse its discretion in (1) restricting his use of an article from a medical journal to impeach certain witnesses, and (2) precluding him from (a) questioning the defendants' expert witness about his previous work as an expert on behalf of Rodin, and (b) making an offer of proof and marking a document for identification in connection with that proffered questioning. We disagree with the plaintiff's claims and, accordingly, affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the relevant facts and procedural history in detail. See *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 597–600. To briefly summarize, the plaintiff sustained a comminuted tibial plateau fracture[4] while playing basketball on March 4, 2005. At approximately 10 p.m. that evening, he was taken to the emergency department of Saint Mary's Hospital, where he was treated and released. The plaintiff returned at approximately 7:30 a.m. the following morning complaining of severe pain in his left leg, and Rodin admitted the plaintiff for observation. At approximately 6:45 p.m. that evening, Rodin diagnosed the plaintiff with compartment syndrome and treated it by performing a four compartment fasciectomy.[5] Thereafter, the plaintiff commenced this action alleging that Rodin was negligent in failing to diagnose and treat his compartment syndrome on the morning of March 5, 2005, and that the delay in treatment caused, among other things, severe and permanent injuries. Following a trial, in response to an interrogatory, the jury found that the defendants had not breached the standard of care. The jury returned a verdict for the defendants and the trial court rendered judgment in accordance with that verdict.

On appeal to the Appellate Court, the plaintiff claimed that the trial court abused its discretion in barring him

from using an article from a medical journal for the purpose of impeaching Rodin's credibility, and in limiting his use of the same article in his cross-examination of Andrew Bazos, the defendants' expert witness. Id., 605–607. In addition, the plaintiff claimed that the trial court improperly precluded him from questioning Bazos about his previous work as an expert on behalf of Rodin in other malpractice actions. Id., 623. With respect to the plaintiff's attempt to ask Bazos about his prior work on behalf of Rodin, the plaintiff also contended that the trial court precluded him from creating an adequate record of that claim for appellate review by denying him the opportunity to make an offer of proof and to mark a particular document for identification. The Appellate Court concluded that none of the challenged evidentiary rulings constituted an abuse of the trial court's discretion. Id., 600–601. The Appellate Court further concluded that, although the trial court should not have barred the plaintiff from making a record as requested, that impropriety was harmless.[6] Id., 623–26. Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 626. On appeal to this court, the plaintiff challenges the Appellate Court's conclusions with respect to each of these issues. Additional facts and procedural history will be set forth as necessary.

Before turning to the merits of the plaintiff's claims, we briefly set forth the standard of review applicable to those claims. It is well settled that "[w]e review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). Under the abuse of discretion standard, "[w]e [must] make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 402, 3 A.3d 892 (2010). Moreover, "[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . [A]n evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the jury's verdict. . . . A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial. . . . [Finally, our] review of the Appellate Court's conclusions of law, including the determination that any evidential improprieties were harmless, is plenary." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 254–55, 9 A.3d 364 (2010).

I

The plaintiff first claims that the Appellate Court improperly determined that the trial court did not abuse its discretion in (1) prohibiting him from using the journal article to impeach Rodin, who had read the article prior to his deposition, and (2) limiting his use of the article during his cross-examination of Bazos. We reject both of these contentions.

A

We first address the plaintiff's claim concerning the trial court's ruling precluding him from using the article to impeach Rodin's credibility. Specifically, the plaintiff maintains that, although Rodin suggested during his deposition that the article in question supported his testimony concerning the diagnosis and treatment of compartment syndrome, the article actually contradicts his deposition testimony in several respects. According to the plaintiff, he was entitled to use the article to establish that Rodin did not testify truthfully during his deposition.

The following facts and procedural history, some of which is set forth in the opinion of the Appellate Court, are relevant to this claim. "Counsel for the plaintiff deposed Rodin in March, 2009. At that time, Rodin testified that, in preparation for his deposition, he had reviewed an article in the Journal of the American Academy of Orthopaedic Surgeons, but that he had not brought the journal article to the deposition.[7] Later, the plaintiff's counsel undertook a literature search and found an article published in the subject journal that she believed to be the one Rodin reviewed. On March 6, 2011, as trial was about to begin, the plaintiff filed a supplemental list of exhibits that included, among other things, '[S. Olson & R. Glasgow, "Acute Compartment Syndrome in Lower Extremity Musculoskeletal Trauma," 13 J. Am. Acad. Orthopaedic Surgeons, No. 7 (November, 2005)].'

"The defendants filed an objection to the plaintiff's supplemental list of exhibits, including the journal article. The defendants claimed prejudice due to the plaintiff's late disclosure of the journal article and sought to preclude its use at trial. . . . On May 10, 2011, the court held a hearing regarding the defendants' objection to putting the journal article into evidence at trial. The plaintiff's counsel argued that Rodin had referred to the journal article during his deposition . . . . [The defendants] . . . contended that Rodin had referred in general to a journal article, not to a specific journal article, and that the plaintiff had failed to demonstrate that the article found by the plaintiff's counsel was, in fact, the one Rodin had reviewed. Moreover, [the defendants argued that the article was not admissible pursuant to the learned treatise exception to the hearsay rule; see Conn. Code Evid. § 8-3 (8);[8] because] Rodin was a fact witness, not an expert witness, and no expert

had testified that the journal article was a standard authority in accordance with § 8-3 [8] of the Connecticut Code of Evidence. . . . The court . . . conditionally overruled the defendants' objection with respect to Rodin." (Footnotes added.) *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 602–603.

At trial, the court instructed plaintiff's counsel that, before questioning Rodin about the article in the presence of the jury, she would be required to make an offer of proof. Outside the presence of the jury,[9] "Rodin testified that he did not recall reading a journal article before his deposition. . . . [He] acknowledged [however] that, during his deposition, he testified that he had reviewed a journal article. [The] [p]laintiff's counsel presented Rodin with a copy of the journal article that she had located and asked him if it was the article he had reviewed. Rodin did not recognize the journal article nor did he remember reading it. [The] [p]laintiff's counsel then presented Rodin with copies of what she represented were the tables of contents of the Journal of the American Academy of Orthopaedic Surgeons for [2004 through 2009]. The table[s] of contents disclosed only one article concerning compartment syndrome, which was published in November, 2005.

"Following the plaintiff's offer of proof with respect to the tables of contents, the court found that the journal article discovered by the plaintiff's counsel published in the Journal of the American Academy of Orthopaedic Surgeons in November, 2005, entitled 'Acute Compartment Syndrome in Lower Extremity Musculoskeletal Trauma,' was the article reviewed by Rodin prior to his deposition. The court [initially indicated that it would admit] into evidence a copy of the journal article because Rodin testified that 'he relied on this journal article in preparation for his deposition . . . .' " Id., 608–609. After additional argument on the issue, however, the court indicated that it would reconsider its ruling based on arguments provided by the parties prior to the next trial day.

"Prior to the next trial day, the defendants submitted a memorandum of law in opposition to the admission of the journal article through a nonexpert witness to impeach the credibility of that witness. Rodin had not been disclosed as an expert witness. The defendants argued that the journal article was hearsay and the learned treatise exception to the hearsay rule did not apply because the article had not been identified as authoritative nor was it relied upon by an expert witness. The defendants further argued that the plaintiff intended to use the journal article for substantive purposes. Counsel for the plaintiff [argued] that Rodin's deposition testimony was untruthful as it was at odds with the substance of the journal article, although Rodin had testified that his testimony was consistent with the journal article." Id., 609. The plaintiff made clear that

he was not offering the article under the learned treatise exception or for the truth of the matter asserted in the article. Rather, the plaintiff explained that he intended to use the article for the nonhearsay purpose of impeaching Rodin's credibility by establishing that Rodin had been untruthful in his deposition testimony. Specifically, the plaintiff pointed to the following exchange between the plaintiff's counsel and Rodin during Rodin's deposition:

"Q. Did you review any literature in preparation for your deposition today?

"A. I did look at one  .  .  .  article.

"Q. What did you look at?

"A. Journal of American Academy of Orthopaedic Surgery.

"Q. What article did you review?

"A. An article on compartment syndrome.

"Q. When was that article published?

"A. I believe 2005; I'm not sure exactly.

"Q. What did the article say?

"A. Just a review about what compartment syndrome is, and diagnosis and treatment.

"Q. What did it list in there about diagnosis and treatment?

"A. Similar to things I've already mentioned in terms of specific things to look at on clinical examination."

The plaintiff claimed that this portion of Rodin's deposition testimony suggested that the article was consistent with his opinion concerning the diagnosis and treatment of compartment syndrome when, in fact, the article was inconsistent with his testimony in several respects.[10] To demonstrate that Rodin's deposition testimony was false in that regard, the plaintiff's counsel sought to question Rodin about his deposition testimony describing the diagnosis and treatment of compartment syndrome, to confront Rodin with portions of the article that contradicted his testimony on certain points, and to introduce those excerpts from the article into evidence.[11] The trial court vacated its order from the previous day and ruled that the article was inadmissible. The court did allow the plaintiff's counsel to supplement her offer of proof on this issue and, for that purpose, she confronted Rodin with the contradictions between his deposition testimony and the article.[12]

On appeal to the Appellate Court, the plaintiff claimed that the trial court improperly precluded him from using the journal article to impeach Rodin's credibility. The plaintiff maintained that Rodin had not been truthful in testifying that his deposition testimony was consistent with the journal article, and that he "was entitled to

bring . . . Rodin's lack of candor to the attention of the jury." *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 607. The plaintiff further maintained that the learned treatise exception to the hearsay rule was inapplicable to his claim because he had not sought admission of the article as substantive evidence but, rather, merely to impeach Rodin's credibility by demonstrating that he was untruthful when he suggested in his deposition testimony that the article supported his opinion. The Appellate Court rejected the plaintiff's claim, concluding that the trial court did not abuse its discretion in precluding him from using the article to cross-examine Rodin because "[t]he trial court has discretion to limit the admissibility of a learned treatise when used to undermine or bolster credibility dependent on the facts of a particular case." Id., 611. In support of its conclusion, the Appellate Court further observed that Rodin had not been disclosed as an expert witness and that "no expert in this case had identified the article as standard authority . . . ." Id. The Appellate Court, believing that the plaintiff had questioned Rodin in front of the jury about his failure to recall at trial that he had reviewed an article in preparation for his deposition; see footnote 9 of this opinion; also concluded that, even if the trial court had abused its discretion in precluding the plaintiff from introducing the article to impeach Rodin's credibility, any such impropriety was harmless. *Filippelli* v. *Saint Mary's Hospital*, supra, 611–12.

On appeal to this court, the plaintiff challenges the Appellate Court's conclusion that the trial court properly exercised its discretion in refusing to admit the article pursuant to the learned treatise exception because that was not the theory on which he relied in seeking to introduce the article at trial. The plaintiff also contends that the Appellate Court's conclusion was predicated on the mistaken belief that the plaintiff had questioned Rodin in the presence of the jury with respect to his failure to recall that he had reviewed the article in preparation for his deposition. We agree with the plaintiff both that the learned treatise exception has no bearing on whether the article was admissible for the purpose of impeaching Rodin's credibility and that the record indicates that the questioning at issue took place outside the presence of the jury. We nevertheless conclude that the trial court did not abuse its discretion in precluding the plaintiff from using the article to impeach Rodin's credibility. Even if Rodin did suggest during his deposition that the article supported his testimony; but see footnote 10 of this opinion; the article was inadmissible for that purpose because extrinsic evidence generally is not admissible to impeach a witness by proving that he or she engaged in an act of misconduct.[13]

Although our rules of evidence generally prohibit evidence of misconduct to prove the character of a wit-

ness; see Conn. Code Evid. § 4-5; one exception to that rule allows a party to impeach the credibility of a witness by asking about particular acts of misconduct that tend to demonstrate the witness' lack of veracity. Conn. Code Evid. § 6-6 (b) (1).[14] As we previously have recognized, "[a] claim that [a] witness gave false testimony [under oath] in a prior [proceeding] is directly relevant to a witness' credibility." *Weaver* v. *McKnight*, 313 Conn. 393, 427, 97 A.3d 920 (2014). Our evidentiary rules also provide, however, that extrinsic evidence generally may not be used to establish that a witness engaged in such misconduct.[15] Conn. Code Evid. § 6-6 (b) (2). Rather, "the only way to prove misconduct of a witness for impeachment purposes is through examination of the witness. See, e.g., *Martyn* v. *Donlin*, 151 Conn. 402, 408, 198 A.2d 700 (1964). The party examining the witness must accept the witness' answers about a particular act of misconduct and may not use extrinsic evidence to contradict the witness' answers. *State* v. *Chance*, [236 Conn. 31, 60, 671 A.2d 323 (1996)]."[16] *Weaver* v. *McKnight*, supra, 427. This limitation on the use of extrinsic evidence to prove specific acts of misconduct "prevents a trial within a trial on the collateral question of whether the witness did, in fact, commit the alleged misconduct." Id., 430; see also C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 6.32.5, pp. 400–401.

In the present case, the plaintiff sought to introduce the article for the improper purpose of proving through extrinsic evidence that Rodin testified falsely in response to questioning at his deposition. A review of the transcript from the plaintiff's offer of proof demonstrates that allowing the plaintiff to use the article for this purpose would have created a "trial within a trial" on the collateral issue of whether Rodin had, in fact, testified falsely at his deposition. See *Weaver* v. *McKnight*, supra, 313 Conn. 430. First, because the plaintiff did not request the article at the time of the deposition, and because Rodin testified in connection with the offer of proof that he could not recall reading the article, the plaintiff would have had to present extensive evidence merely to establish that the article in question was the article that Rodin had read prior to the deposition. In attempting to do so in his first offer of proof, the plaintiff confronted Rodin with his deposition testimony in which he indicated that he had read an article from the Journal of American Academy of Orthopaedic Surgery about the diagnosis and treatment of compartment syndrome that he believed was published in 2005. The plaintiff then asked Rodin whether the article in question was the article that he had reviewed. Because Rodin could not recall reading the article prior to his deposition, the plaintiff then introduced the tables of contents from all of the issues of that journal that had been published between 2004 and 2009 for the purpose of establishing that the 2005

article was the only one dealing with compartment syndrome. All of this evidence was offered to establish that the article in question was the article that Rodin had reviewed prior to his deposition. In support of the plaintiff's supplemental offer of proof, he adduced additional evidence to demonstrate that the information contained in the article was inconsistent with Rodin's deposition testimony. To that end, the plaintiff's counsel asked Rodin several questions about the contents of the article, and Rodin responded to each one that he could not answer without first reading the article. Finally, counsel confronted Rodin with several portions of his deposition testimony wherein he had provided information concerning the diagnosis and treatment of compartment syndrome that differed from the information contained in the article.

The plaintiff sought to introduce all of this evidence solely for the purpose of establishing that, despite Rodin's alleged suggestion to the contrary, the article on which he relied to prepare for his deposition was inconsistent with his deposition testimony. Because Rodin was a fact witness and not an expert witness, however, he testified only about his own treatment of the plaintiff, and did not offer an expert opinion on the standard of care for the diagnosis and treatment of compartment syndrome.[17] Thus, whether the article and Rodin's deposition testimony were consistent was collateral to the substantive issue of whether he was negligent in his diagnosis and treatment of the plaintiff. See *Martyn* v. *Donlin*, supra, 151 Conn. 407–408 (in wrongful death action, trial court properly excluded documents offered for collateral issue of whether defendant police officer lied on job application). We have long recognized that "[s]uch a minitrial about a collateral issue distracts from the main issues at trial, wastes the court's and the jury's time, and is frequently based on hearsay evidence of questionable value." *Weaver* v. *McKnight*, supra, 313 Conn. 430; see also *State* v. *O'Neill*, 200 Conn. 268, 277, 511 A.2d 321 (1986); *State* v. *Horton*, 8 Conn. App. 376, 380–81, 513 A.2d 168, cert. denied, 201 Conn. 813, 517 A.2d 631 (1986). As the plaintiff's offers of proof demonstrate, allowing the plaintiff to introduce the article to impeach Rodin's credibility would have resulted in extended, potentially confusing testimony about an issue that was not relevant to any substantive issue to be decided by the jury. Under § 6-6 (b) (2) of the Connecticut Code of Evidence, extrinsic evidence was inadmissible for that purpose.[18] Accordingly, we conclude that the Appellate Court properly concluded that the trial court did not abuse its discretion in precluding the plaintiff from introducing the journal article to impeach Rodin's credibility.

B

The plaintiff next claims that the Appellate Court incorrectly concluded that the trial court did not abuse

its discretion in limiting his use of the same journal article in connection with his cross-examination of the defendants' expert, Bazos. We reject this contention as well.

The following additional facts and procedural history are relevant to this claim. At trial, Ronald M. Krasnick, an orthopedic surgeon, testified as an expert witness on behalf of the plaintiff. Krasnick testified that the Journal of the American Academy of Orthopaedic Surgery is "a standard authority in the field of orthopedic surgery."[19] When Bazos later testified as an expert on behalf of the defendants, the plaintiff sought, during cross-examination, to introduce portions of the article that contradicted Bazos' testimony regarding the standard of care for the diagnosis and treatment of compartment syndrome. The plaintiff argued that the article was admissible under the learned treatise exception to the hearsay rule because Krasnick had identified the Journal of the American Academy of Orthopaedic Surgery, in which the article was published, as a standard authority in the field of orthopedic surgery. See Conn. Code Evid. § 8-3 (8). The defendants objected, arguing that the article was inadmissible because, although Krasnick had testified that the Journal of the American Academy of Orthopaedic Surgery was a standard authority, he did not identify the specific article in question as a standard authority. The defendants further argued that, if the article was admitted under the learned treatise exception, only the portions of the article that the plaintiff used to impeach Bazos' testimony should be admitted as a full exhibit. The trial court concluded that the plaintiff would be allowed to cross-examine Bazos about the article, but that only those portions that the plaintiff used during his cross-examination would be admitted as a full exhibit and published to the jury.

After the trial court's ruling, the plaintiff initially attempted to read certain statements directly from the article during his questioning of Bazos. The defendants objected to the plaintiff reading from the article, however, and the trial court sustained the objection and directed the plaintiff to ask questions without reading from the article. Thereafter, without reading from the article, the plaintiff incorporated portions of the article into his questions by asking Bazos whether he agreed with certain statements. The plaintiff also twice approached Bazos and directed him to certain statements in the article on which the plaintiff's questions were based. After questioning Bazos and directing him to the statements in the article, the plaintiff sought permission to read those statements into the record, but the trial court denied the plaintiff's request. After the completion of the plaintiff's cross-examination, the trial court ruled that the portions of the article on which the plaintiff had not questioned Bazos would be redacted, with the redacted version being admitted as

a full exhibit.

On appeal to the Appellate Court, the plaintiff claimed that the trial court had improperly limited his use of the article in connection with his cross-examination of Bazos. The plaintiff argued that the trial court had admitted the entire article as a full exhibit, and that it was improper for the court to prohibit him from reading directly from the article and directing Bazos' attention to certain portions of the article during his cross-examination. The plaintiff also claimed that the trial court improperly permitted only a redacted version of the article to be published to the jury after admitting the entire article as a full exhibit. The Appellate Court concluded that the trial court did not abuse its discretion in limiting the plaintiff's cross-examination of Bazos because the plaintiff had failed to meet the requirements of § 8-3 (8) of the Connecticut Code of Evidence regarding the admission of a learned treatise. Specifically, the Appellate Court explained that "[b]oth Krasnick and Bazos testified that there is no standard authority regarding the diagnosis of compartment syndrome and that their knowledge of the care and treatment of such a condition is based on their reading of the whole of orthopedic literature and their education, training and experience as orthopedic surgeons." *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 613. The Appellate Court also concluded that the trial court did not abuse its discretion in admitting only those portions of the article on which Bazos was questioned. Id., 613 n.18.

The plaintiff now claims that the Appellate Court improperly determined that the trial court did not abuse its discretion by limiting his use of the journal article during his cross-examination of Bazos because, contrary to the conclusion of the Appellate Court, the plaintiff had met the foundational requirements of the learned treatise exception. The plaintiff maintains that, because the trial court found that the article was admissible as a learned treatise under § 8-3 (8) of the Connecticut Code of Evidence, it was improper for the trial court to limit his use of the article. The defendants contend to the contrary that the article should not have been admitted into evidence for any purpose because the plaintiff failed to meet the foundational requirements of the learned treatise exception and, in the alternative, that the trial court had the discretion to limit the plaintiff's use of the article on cross-examination. We reject the plaintiff's claim because, even if the plaintiff did meet the requirements for the admission of the article as a learned treatise, the trial court properly exercised its discretion in limiting the plaintiff's use of the article during cross-examination.

Under § 8-3 (8) of the Connecticut Code of Evidence, "a statement contained in a published treatise, periodical or pamphlet on a subject of history, medicine, or other science or art" may be admitted into evidence as

an exception to the hearsay rule if two foundational requirements are satisfied. "First, the work must be recognized as a standard authority in the field by the witness, other expert witness or judicial notice, and, second, the work must either be brought to the attention of the witness on cross-examination or have been relied on by that expert during direct examination." (Internal quotation marks omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 367, 788 A.2d 496 (2002). Connecticut's learned treatise rule "differs from that of most other jurisdictions, including the federal rule, in that we allow the material to be taken into the jury room as a full exhibit. . . . Most other jurisdictions bar such material from the jury room, limiting their use to an oral reading in connection with an expert witness' testimony. . . . This limitation seeks to avoid the danger of misunderstanding or misapplication by the jury and ensures that the jurors will not be unduly impressed by the text or use it as a starting point for reaching conclusions untested by expert testimony. . . . The Connecticut rule, on the other hand, has the advantage of allowing the jurors to examine more fully the text of what frequently is a technical and complicated discussion that may be unfathomable to a nonexpert juror who merely heard a single oral recitation. Although the concerns which underlie the federal rule cannot be completely obviated when the materials are allowed in the jury room, the dangers can be minimized by the judicious exercise of discretion by the trial court in deciding which items ought to be admitted as full exhibits." (Internal quotation marks omitted.) *State* v. *Gupta*, 297 Conn. 211, 239, 998 A.2d 1085 (2010); see also C. Tait & E. Prescott, supra, § 7.11.3, pp. 478–79.

As stated previously, for a writing to be admissible under the learned treatise exception, it must be identified as a "standard authority in the field," either by an expert witness or by judicial notice. Conn. Code Evid. § 8-3 (8). The question arises, however, whether admissibility under the learned treatise exception requires testimony by the expert witness that the particular *article* is a standard authority, or whether it is sufficient, as occurred in the present case, that the expert merely identify the *journal* as such authority.

Although we have not had occasion to do so, the Appellate Court previously addressed this issue in *Musorofiti* v. *Vlcek*, 65 Conn. App. 365, 382–85, 783 A.2d 36, cert. denied, 258 Conn. 938, 786 A.2d 426 (2001). In that case, after the plaintiff's treating physician identified the Journal of the American Dental Association as a standard authority in the dental profession, the trial court allowed the defendants to introduce an article from that journal pursuant to the learned treatise exception. Id., 382–83. On appeal, the plaintiffs claimed that "acceptance of the journal that contained the article [as a standard authority in the field] was insufficient to qualify the article contained therein as a learned

treatise." Id., 384. In support of this claim, the plaintiffs relied on *Meschino* v. *North American Drager, Inc.*, 841 F.2d 429, 434 (1st Cir. 1988), in which the United States Court of Appeals for the First Circuit, addressing a similar claim, stated that it "would not accept [the] plaintiff's argument that the contents of all issues of a periodical may be qualified wholesale under [r]ule 803 (18) [of the Federal Rules of Evidence] by testimony that the magazine was highly regarded. In these days of quantified research, and pressure to publish, an article does not reach the dignity of a 'reliable authority' merely because some editor, even a most reputable one, sees fit to circulate it. Physicians engaged in research may write dozens of papers during a lifetime. Mere publication cannot make them automatically reliable authority."

The Appellate Court generally agreed with the reasoning of the court in *Meschino*, stating that it "would not accept that *all* articles in a periodical may be qualified as learned through the mere demonstration that the periodical itself is highly regarded." (Emphasis in original.) *Musorofiti* v. *Vlcek*, supra, 65 Conn. App. 384. The Appellate Court further observed, however, that *Meschino* should not be read as creating a per se rule, and that there may be circumstances in which a particular periodical is so highly regarded within a field that all articles published therein would be admissible as a learned treatise. Thus, the Appellate Court endorsed the approach taken by the United States Court of Appeals for the Second Circuit in *Costantino* v. *Herzog*, 203 F.3d 164, 172 (2d Cir. 2000), wherein the court stated that "[p]ublication practices vary widely, and an article's publication by an esteemed periodical which subjects its contents to close scrutiny and peer review, obviously reflects well on the authority of the article itself. Indeed, because the authoritativeness inquiry is governed by a 'liberal' standard, good sense would seem to compel recognizing some periodicals—provided there is a basis for doing so—as sufficiently esteemed to justify a presumption in favor of admitting the articles accepted for publication therein." The Appellate Court concluded in *Musorofiti* that, under the circumstances of that case, the trial court did not abuse its discretion in admitting the article based on testimony that the journal "was widely read, recognized and accepted in the dental profession as authoritative." *Musorofiti* v. *Vlcek*, supra, 382–83; see id., 385. We agree generally with the approach adopted by the Appellate Court in *Musorofiti*.

In the present case, it is questionable whether Krasnick's testimony provided an adequate foundation for establishing the admissibility of the article under § 8-3 (8) of the Connecticut Code of Evidence. Although we agree, as the Appellate Court recognized in *Musorofiti* v. *Vlcek*, supra, 65 Conn. App. 385, that evidence that a journal is particularly esteemed within a field may

"justify a presumption in favor of admitting the [article] accepted for publication therein," it is by no means clear that Krasnick's testimony met that standard with respect to the Journal of the American Academy of Orthopaedic Surgery. Indeed, Krasnick testified that "[a]ll journals are used as reference tools by orthopedic surgeons." Krasnick's testimony that the Journal of the American Academy of Orthopaedic Surgery is one publication among many relied on by orthopedic surgeons as a general reference tool does not provide a particularly firm basis for concluding that that publication is regarded as so authoritative and respected within the field of orthopedic surgery that all articles published therein merit learned treatise status.

Even assuming that the plaintiff satisfied the requirements of § 8-3 (8) of the Connecticut Code of Evidence for admission of the article as a learned treatise, however, the trial court did not abuse its discretion in limiting the plaintiff's use of the article on cross-examination. The essence of the plaintiff's claim is that the trial court unduly limited his use of the article by requiring him to incorporate portions of it into his questions, rather than allowing him to read directly from the article, because it had been marked as a full exhibit. Significantly, however, the plaintiff's assertion that the trial court had marked the entire article as a full exhibit is belied by the record. Although the trial court initially indicated that the entire article would be admitted as a full exhibit, after hearing further argument from the defendants, the court indicated that only the portions of the article on which the plaintiff questioned Bazos would be marked as a full exhibit and published to the jury.[20] Moreover, the mere fact that the trial court found that the article met the requirements for admissibility under the learned treatise exception does not mean that the court was required to allow the plaintiff unfettered use of the article. Section 8-3 (8) merely provides that materials which meet the foundational requirements of the learned treatise exception are "not excluded by the hearsay rule," and does not mandate the admission of such materials or otherwise "purport to circumscribe the discretion generally afforded to a trial court to determine the admissibility of evidence in light of the facts of record." *Harlan* v. *Norwalk Anesthesiology, P.C.*, 75 Conn. App. 600, 607, 816 A.2d 719, cert. denied, 264 Conn. 911, 826 A.2d 1155 (2003). As discussed previously, we have long recognized that this state's approach to the learned treatise exception, which allows materials admitted under the rule to be treated as full exhibits and taken into the jury room during deliberations, carries "the danger of misunderstanding or misapplication by the jury" that other jurisdictions seek to avoid by precluding the admission of such materials as full exhibits. *Cross* v. *Huttenlocher*, 185 Conn. 390, 396, 440 A.2d 952 (1981). We therefore have explained that trial courts may minimize the risks

posed by the rule by use of "the judicious exercise of discretion . . . in deciding which items ought to be admitted as full exhibits." Id., 396–97; see also id., 397–98 (trial court properly exercised discretion in excluding portions of medical texts recognized as standard authority in field that were likely to confuse or mislead jury).

In the present case, it was well within the trial court's discretion to preclude the plaintiff from reading directly from the article during his cross-examination of Bazos, and to admit as a full exhibit only the portions of the article about which Bazos was questioned. The trial court did not, as the plaintiff argues, preclude him from "engaging in any cross-examination of [Bazos] with the article . . . ." Rather, the record reveals that the plaintiff's counsel questioned Bazos extensively as to whether he agreed with the information contained in the article and, in many instances, counsel quoted the article verbatim in connection with his questioning.[21] On at least two occasions, counsel approached Bazos, directed him to the portion of the article on which the question was based, and asked whether he agreed with a particular statement. Finally, the redacted version of the article that the trial court admitted as a full exhibit contained all of the sections of the article that the plaintiff's counsel had incorporated into her questions. Thus, although the trial court did not allow the plaintiff to read the article into the record, the jury was able to read the article for itself and compare it to Bazos' testimony.

Additionally, it bears emphasis that, contrary to the plaintiff's claim, the article was not a full exhibit until *after* he completed his cross-examination and the trial court was able to redact the portions of the article on which the plaintiff did not rely. It was not an abuse of discretion for the trial court to preclude the plaintiff from reading from a document that was not yet a full exhibit; see *Kaplan* v. *Mashkin Freight Lines, Inc.*, 146 Conn. 327, 334–35, 150 A.2d 602 (1959); and to postpone admitting the article as a full exhibit until after the plaintiff had finished his cross-examination, when the court could determine which portions of the article were relevant to Bazos' testimony. See *State* v. *Wade*, 96 Conn. 238, 251, 113 A. 458 (1921) ("The question of the cross-examiner [confronting a witness with a learned treatise] must be confined to such parts of the authority as tend to contradict the opinion as expressed by the witness. It cannot be based upon some illustration or isolated case used by the authority to explain or illustrate his opinion."). Accordingly, the Appellate Court properly concluded that the trial court did not abuse its discretion in limiting the plaintiff's use of the article while cross-examining Bazos.

## II

The plaintiff also claims that the Appellate Court improperly concluded that the trial court did not abuse

its discretion in precluding him from questioning Bazos about his previous experience as an expert on behalf of Rodin. The plaintiff maintains that this evidence was relevant because Bazos falsely testified at his deposition that he had never worked with Rodin and that the only other case in which he remembered giving deposition testimony was one in which Rodin was not a party. According to the plaintiff, he should have been allowed to ask Bazos about this prior experience with Rodin for the purpose of impeaching Bazos' credibility. Finally, the plaintiff asserts that, contrary to the determination of the Appellate Court, the trial court's failure to permit him to make an offer of proof and to mark an exhibit for identification prevented him from making an adequate record of this claim. We reject each of these contentions.

The following additional facts and procedural history are relevant to this claim. On April 4, 2011, approximately one month prior to the commencement of trial, counsel for the plaintiff deposed Bazos. During the deposition, the plaintiff's counsel briefly questioned Bazos about his prior experience serving as an expert witness, and whether he had ever heard of or worked for Rodin. When asked whether he remembered the names of any physicians for whom he previously had provided expert deposition testimony, Bazos stated, "[t]he only one I remember, because it was relatively recent, was [a physician named] Geiger." When asked whether he had ever heard of Rodin before his involvement in this case, Bazos testified, "I've seen his name; I've not worked with him, but Waterbury is not that far away, and we'll occasionally see patients that live there and may have been treated out there in the past."

Prior to trial, the defendants filed a motion in limine to preclude evidence relating to other malpractice actions against Rodin. At a pretrial hearing on the motion, the plaintiff indicated that, although he did not intend to question Rodin with respect to other malpractice claims, he did intend to ask Bazos whether he had served as an expert witness on behalf of Rodin in any other cases. The plaintiff claimed that Bazos had testified falsely during his deposition when asked about his relationship with Rodin, and that he intended to impeach Bazos' credibility by bringing that false testimony to the jury's attention. Specifically, the plaintiff indicated that, prior to the present case, Bazos had been disclosed as an expert witness on behalf of Rodin in two other medical malpractice cases. The plaintiff argued that Bazos intentionally concealed his relationship with Rodin when he stated that he only remembered testifying as an expert witness on behalf of Geiger and suggested that he had no knowledge or familiarity with Rodin other than having come across his name in the course of his practice. The plaintiff maintained that he should be allowed to question Bazos regarding his previous work as an expert on behalf of Rodin to show

that Bazos lied during his deposition. The defendants argued that Bazos did not testify falsely at his deposition, but simply had misunderstood the questions asked by the plaintiff's counsel,[22] and that Bazos intended to submit an errata sheet to clarify his answers. The defendants further argued that allowing the plaintiff to present evidence that Bazos had served as an expert on behalf of Rodin in other malpractice cases would be unfairly prejudicial because it would reveal that Rodin previously had been sued by other patients. The trial court agreed with the defendants that evidence of other malpractice claims against Rodin would be unduly prejudicial, but also concluded that the plaintiff should be allowed to ask Rodin whether he lied under oath at his deposition. The trial court therefore granted in part the defendants' motion in limine, ruling that the plaintiff could ask Bazos whether he had a prior "working relationship" with Rodin, but not whether he had previously served as an expert witness on Rodin's behalf.

At trial, the plaintiff renewed his request to question Bazos about his prior work for Rodin. As an additional basis for the plaintiff's belief that Bazos had testified falsely at his deposition when he claimed only to remember testifying as an expert on behalf of Geiger, the plaintiff indicated that Bazos gave deposition testimony on behalf of Rodin in another case just two months prior to his deposition in the present case, whereas his deposition testimony on behalf of Geiger was given approximately one year earlier. The plaintiff also claimed that, just five days before his deposition in this case, Bazos signed an errata sheet for a deposition he had given on behalf of Rodin in another case. The plaintiff then requested the opportunity to make an offer of proof outside the presence of the jury. The trial court reaffirmed its original ruling and denied the plaintiff's request to make an offer of proof.

Following Bazos' testimony, the plaintiff asked to mark for identification the certification page of a deposition Bazos had given on behalf of Rodin in another case. The trial court denied the plaintiff's request, but allowed the plaintiff to read the certification page into the record.

On appeal to the Appellate Court, the plaintiff claimed that the trial court had abused its discretion both by precluding him from questioning Bazos about his work as an expert on behalf of Rodin and by denying his request to make an offer of proof and mark the certification page as an exhibit for identification. With respect to the first claim, the Appellate Court concluded that the trial court reasonably precluded the plaintiff from introducing evidence of other medical malpractice actions in which Bazos had testified on behalf of Rodin on the ground that such evidence was more prejudicial than probative. *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 622. With respect to the plaintiff's

second contention, the Appellate Court concluded that, although the trial court improperly denied the plaintiff's request to make an offer of proof and mark an exhibit for identification, both errors were harmless. Id., 623–26.

As discussed in part I of this opinion, our evidentiary rules allow a party to impeach a witness by asking about specific acts of misconduct that are probative of the witness' lack of veracity; Conn. Code Evid. § 6-6 (b) (1); and false testimony given under oath is a classic example of misconduct that may be used for such purposes. See *Weaver* v. *McKnight*, supra, 313 Conn. 427. We have long recognized, however, that the right to cross-examine a witness with respect to such acts is not unlimited. "First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the issue of veracity . . . . Second, extrinsic evidence of such acts is generally inadmissible [unless the prior acts of misconduct are relevant to a material or substantive issue in the case]. Conn. Code Evid. § 6-6 (b) (2)." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Annulli*, 309 Conn. 482, 492, 71 A.3d 530 (2013). Finally, consistent with the broad leeway that trial courts have in regard to rulings pertaining to the admissibility of evidence, "[w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court." Id., 492–93; see also C. Tait & E. Prescott, supra, § 6.32.4, p 399 ("[c]ross-examination into the misconduct of a witness for impeachment purposes is discretionary with the trial judge, as to both allowance and extent").

In the present case, it is apparent that the trial court properly exercised its discretion in precluding the plaintiff from questioning Bazos as to whether he previously had testified as an expert on behalf of Rodin. First, whether Bazos previously served as an expert on behalf of Rodin was a collateral matter because it was relevant only to Bazos' credibility and not to any substantive issue in the case. See *State* v. *Annulli*, supra, 309 Conn. 494–95 ("[a]n issue is collateral if it is not relevant to a material issue in the case *apart from its tendency to contradict the witness*" [emphasis in original; internal quotation marks omitted]). In other words, although Bazos' alleged false deposition testimony bore on his veracity, his relationship with Rodin was not relevant to the plaintiff's claim that Rodin was negligent in failing to timely diagnose and treat the plaintiff's compartment syndrome.[23] Furthermore, for obvious reasons, evidence of prior claims of professional negligence against Rodin, which were not otherwise admissible, would have been highly prejudicial to the defendants. Thus, as the trial court concluded, allowing the plaintiff unrestricted inquiry into Bazos' work as an expert for Rodin would have injected a collateral issue into the case that was extremely prejudicial to the defendants.

More importantly, the trial court did not bar the plaintiff from questioning Bazos whether he had testified falsely during his deposition, but simply precluded the plaintiff from asking Bazos about the nature of his relationship with Rodin, because allowing the plaintiff to do so would have revealed to the jury that other patients had filed malpractice actions against Rodin. As the trial court recognized, allowing the plaintiff to conduct this line of inquiry would have created a substantial risk that the jury might infer that Rodin was negligent in the present case because he had been a defendant in other medical malpractice actions. See *Lai* v. *Sagle*, 373 Md. 306, 323, 818 A.2d 237 (2003) ("similar acts of prior malpractice litigation should be excluded to prevent a jury from concluding that a doctor has a propensity to commit medical malpractice"); cf. Conn. Code Evid. § 4-5 (a) ("[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person"); 1 K. Broun, McCormick on Evidence (7th Ed. 2013) § 189, pp. 1025–26. The court also recognized, however, that the plaintiff had a legitimate interest in impeaching Bazos' credibility by questioning him about his allegedly false or misleading deposition testimony. The court sought to balance these concerns by allowing the plaintiff to confront Bazos with the portion of his deposition testimony in which he stated that he was only familiar with Rodin's name because he had seen it in his patients' medical records and to ask whether Bazos had a "working relationship" with Rodin, but precluded the plaintiff from inquiring more specifically about other malpractice cases against Rodin.

Thus, on cross-examination, the plaintiff asked Bazos whether he had "an ongoing working relationship with [Rodin] since about 2008," which was three years before his deposition testimony, and Bazos responded in the affirmative. The plaintiff then confronted Bazos with the portion of his deposition testimony in which, when counsel for the plaintiff asked whether he had ever "heard of [Rodin] before being involved in this case," Bazos stated that he had "seen [Rodin's] name" but had "not worked with him  . . . ." Bazos testified that he did, in fact, have a working relationship with Rodin, but that he had met Rodin for the first time the day before the trial. At that time, the plaintiff expressly underscored the contradiction between Bazos' deposition testimony and his admission that he had an ongoing relationship with Rodin for about three years, and suggested that Bazos' deposition testimony "made it appear as though [Bazos] may have come across [Rodin's] name . . . in one of [his] patient's records."

Although this cross-examination likely would have been more damaging to Bazos' credibility had the plaintiff been permitted to ask about his prior work as an expert on behalf of Rodin, the trial court properly

weighed the plaintiff's interest in impeaching Bazos against the substantial likelihood of prejudice to the defendants had such questioning been permitted. The record reveals that the trial court carefully considered the arguments of the parties[24] in the interest of fashioning a solution that gave the plaintiff an opportunity to bring the alleged false testimony to the jury's attention without the high risk of unfairness to the defendants that have would resulted from evidence revealing other malpractice actions against Rodin. The decision on how best to preserve the fairness and integrity of the trial in this situation is precisely the kind of determination best left to the discretion of the trial court, and that decision will not be disturbed on appeal unless it was arbitrary or unreasonable.[25] *State* v. *Annulli*, supra, 309 Conn. 495. Because the trial court carefully weighed the competing interests and afforded the plaintiff the opportunity to impeach Bazos' credibility by asking him about his allegedly false deposition testimony, the trial court's handling of the issue was fair and reasonable. Accordingly, we agree with the Appellate Court that the trial court did not abuse its discretion in precluding the plaintiff from questioning Bazos about his work on behalf of Rodin in other cases.

Finally, we also agree with the Appellate Court that, although the trial court should have allowed the plaintiff both to make an offer of proof regarding Bazos' previous work as an expert on behalf of Rodin and to mark for identification the certification page from Bazos' deposition in one of those previous cases, neither such impropriety was harmful to the plaintiff. See *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 623–26. As a general matter, a trial court should *always* allow a party to make an offer of proof and mark an item as an exhibit for identification, for both practices generally are necessary to preserving the trial record for appellate review. See *State* v. *Silva*, 201 Conn. 244, 253, 513 A.2d 1202 (1986) ("the general rule has evolved that the trial court *must* mark as an exhibit for identification *anything* offered by counsel" [emphasis in original]); *State* v. *Zoravali*, 34 Conn. App. 428, 433, 641 A.2d 796 ("The appellant bears the burden of providing an adequate appellate record through the offer of proof, among other vehicles. . . . A trial court cannot prevent a defendant from doing so." [Citation omitted.]), cert. denied, 230 Conn. 906, 644 A.2d 921 (1994); C. Tait & E. Prescott, Connecticut Appellate Practice and Procedure (4th Ed. 2014) § 8-2:1.1, p. 437 ("[i]f necessary [to properly preserve a claim for appellate review], the appellant also must make an offer of proof or offer an exhibit for identification"). In the present case, however, the record is adequate for review of the plaintiff's claims despite the trial court's denial of his request to make an offer of proof and to mark the document for identification. As the Appellate Court observed, "although the court improperly failed to permit the plaintiff's counsel

to make an offer of proof, the court permitted the plaintiff's counsel to argue extensively, on more than one occasion, the legal basis on which she wanted to present evidence of other medical malpractice actions in which Bazos testified as an expert witness . . . ." *Filippelli* v. *Saint Mary's Hospital*, supra, 624. In addition, "[t]he [trial] court permitted the plaintiff's counsel to read the document [she had sought to mark for identification] into the record, which is available for our review." Id., 626. Accordingly, neither of the improper rulings prejudiced the plaintiff in any way.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and ZARELLA and ROBINSON, Js., concurred.

[1] Philip Filippelli's wife, Linda Filippelli, initially alleged claims for loss of consortium, but withdrew those claims prior to trial. All references to the plaintiff in this opinion are to Philip Filippelli III.

[2] The plaintiff withdrew his claims against Saint Mary's Hospital prior to trial. We therefore refer to Rodin and Waterbury Orthopaedic Associates, P.C., as the defendants.

[3] Compartment syndrome is "a condition in which increased pressure in a confined anatomic space adversely affects the circulation and threatens the function and viability of the structures therein." Stedman's Medical Dictionary (28th Ed. 2006) pp. 1894–95.

[4] A comminuted fracture occurs when "the bone is broken into more than two fragments." Stedman's Medical Dictionary (28th Ed. 2006) p. 769. "A tibial plateau fracture occurs at the top of the shin bone, and involves the cartilage surface of the knee joint." J. Cluett, "Tibial Plateau Fractures," (last modified May 16, 2014), available at http://orthopedics.about.com/od/brokenbones/a/tibia_2.htm (last visited September 22, 2015).

[5] A fasciectomy is the "[e]xcision of strips of fascia." Stedman's Medical Dictionary (28th Ed. 2006) p. 706. The fascia is "[a] sheet of fibrous tissue that envelops the body beneath the skin; it also encloses muscles and groups of muscles and separates their several layers or groups." Id., p. 700

[6] The plaintiff also claimed on appeal to the Appellate Court that the trial court improperly precluded him from using the article to confirm the opinion of Ronald M. Krasnick, the plaintiff's expert witness. See *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 605–607. The Appellate Court rejected that claim, and it is not before us in the present appeal.

[7] At that time, plaintiff's counsel did not ask Rodin or Rodin's counsel to produce the article.

[8] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . .

"(8) Statement in learned treatises. To the extent called to the attention of an expert witness on cross-examination or relied on by the expert witness in direct examination, a statement contained in a published treatise, periodical or pamphlet on a subject of history, medicine, or other science or art, recognized as a standard authority in the field by the witness, other expert witness or judicial notice."

[9] The opinion of the Appellate Court indicates that the plaintiff questioned Rodin in the presence of the jury as to whether he remembered reading the article. See *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 608. Our review of the record, however, indicates that the plaintiff questioned Rodin about the article only in connection with the offer of proof, which was conducted outside the presence of the jury. As we explain hereinafter, this discrepancy does not alter our conclusion that the trial court did not abuse its discretion in precluding the plaintiff from introducing the article to impeach Rodin's credibility.

[10] We note that it is questionable whether the portion of Rodin's deposition testimony on which the plaintiff relies would have been construed by the jury to suggest that the article supported his testimony regarding the diagnosis and treatment of compartment syndrome. Rather, it seems much more likely that, when Rodin testified that the information in the article was "[s]imilar to things I've already mentioned in terms of specific things to look at on clinical examination," he meant only that the article covered

similar subject matter, not that it necessarily was consistent with his testimony. The trial court, in the exercise of its discretion, reasonably could have excluded the evidence on that ground. Cf. *State* v. *Annulli*, 309 Conn. 482, 496, 71 A.3d 530 (2013) (fact that testimony was unclear as to whether witness gave false statement weighed against its admission). As discussed hereinafter, however, it is clear that the article also was inadmissible because it constituted extrinsic evidence offered to prove an act of misconduct.

[11] Specifically, the plaintiff's counsel underscored the following discrepancies between Rodin's testimony and the journal article: Rodin testified that compartment pressures are used only to confirm a diagnosis of compartment syndrome and are not taken to make a diagnosis in questionable cases, whereas the article recommends that compartment pressures be taken in order to make a diagnosis under such circumstances; Rodin testified that a patient with compartment syndrome will experience extreme pain upon passive range of motion of the big toe, whereas the article indicates that pain is merely aggravated in such circumstances; and Rodin testified that irreversible tissue damage can occur in two hours, whereas the article indicates that such damage takes eight hours.

[12] In ruling that the article was inadmissible to impeach Rodin, the trial court explained: "The grounds on which the court is not allowing the [article] in is based on the fact that the court finds the journal article to be hearsay. And I've had no satisfactory exception provided to the court for that hearsay." The court further explained that the article "is a learned treatise," that, under our Code of Evidence, "the witness to which this article would be presented would have to be an expert witness," and that the plaintiff could not attack Rodin's credibility because "Rodin has not been designated as an expert witness . . . ." Finally, the court noted that "the article is dated eight months after the care and treatment of [the plaintiff]" and that "Rodin testified he did not review . . . this article in preparation for the care and treatment of [the plaintiff]." The plaintiff, however, did not offer the article pursuant to the learned treatise exception or for the truth of its contents but, rather, to impeach Rodin's credibility by demonstrating that his alleged statement that the article supported his deposition testimony was false. As explained hereinafter, despite the trial court's failure to squarely address the plaintiff's arguments, it is clear that the article was not admissible for the purpose for which the plaintiff offered it.

[13] As noted previously; see footnote 12 of this opinion; the trial court did not rely on this reasoning in ruling that the article was inadmissible to impeach Rodin. The court concluded, rather, that the article was hearsay, that the plaintiff had offered "no satisfactory [hearsay] exception" pursuant to which the article was admissible, and the article was not otherwise admissible under the learned treatise exception. Although at trial the defendants principally argued that the article was inadmissible because it did not meet the requirements of the learned treatise exception, the defendants also asserted that, to the extent it was offered for impeachment purposes, the article related to "a collateral issue." Similarly, in their brief to this court, the defendants argue primarily that the article was inadmissible under the learned treatise exception, but also claim that "there was no other way for the [journal] article to be used against the defendant, a fact witness . . . ." To the extent the defendants have not expressly renewed their contention that the article was inadmissible as extrinsic evidence offered to impeach Rodin on a collateral matter, we note that "[w]here the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it." (Internal quotation marks omitted.) *State* v. *Ruffin*, 206 Conn. 678, 683, 539 A.2d 144 (1988); see also *State* v. *Henry*, 253 Conn. 354, 363–66, 752 A.2d 40 (2000) (although trial court admitted testimony under coconspirator exception to hearsay rule, this court affirmed on ground that testimony was not hearsay); *State* v. *John*, 210 Conn. 652, 679–80, 557 A.2d 93 (affirming trial court's ruling admitting out-of-court statement on different grounds than articulated by trial court, noting that "this court is free to sustain a ruling on a different basis from that relied upon by the trial court"), cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); *State* v. *Badgett*, 200 Conn. 412, 433, 512 A.2d 160 ("this court may . . . consider grounds for affirming a judgment that may have been overlooked by counsel in an appeal to this court"), cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). Because it is clear from the record that the plaintiff sought to use the article for the improper purpose of demonstrating by use of extrinsic evidence that Rodin had engaged in an act of misconduct, we affirm the judgment of the Appellate Court on that basis.

[14] Section 6-6 (b) (1) of the Connecticut Code of Evidence provides: "A witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness."

[15] Extrinsic evidence may be used for such purposes, however, "[w]here . . . prior acts of misconduct are relevant to a substantive or material issue in the case . . . ." (Internal quotation marks omitted.) *State* v. *Annulli*, 309 Conn. 482, 492 n.7, 71 A.3d 530 (2013).

[16] We note that the plaintiff does not claim that the trial court improperly precluded him from asking Rodin whether he testified falsely at his deposition. He claims, rather, that the trial court improperly precluded him from using the article only to demonstrate that Rodin did, in fact, testify falsely.

[17] The parties agree that Rodin did not testify as an expert witness.

[18] The plaintiff makes two additional arguments to support his claim that the trial court abused its discretion in precluding him from introducing the article to impeach Rodin's credibility. Neither of these claims has merit. First, the plaintiff argues that, because Rodin would have testified at trial that he did not recall reviewing the article prior to his deposition, his deposition testimony that he had reviewed the article was a prior inconsistent statement, and the article and the tables of contents therefore were admissible to demonstrate that Rodin was lying when he testified that he did not remember reading the article. This claim fails because whether Rodin reviewed the article prior to his deposition was a collateral issue, and extrinsic evidence is not admissible to impeach a witness regarding an inconsistent statement on a collateral matter. See *State* v. *Diaz*, 237 Conn. 518, 548, 679 A.2d 902 (1996).

Second, the plaintiff argues that the article was relevant to demonstrate that Rodin was untruthful when he sought to explain the meaning of certain statements contained in his medical records. Specifically, on the morning of March 5, 2005, after Rodin first examined the plaintiff upon his return to the emergency department, Rodin documented that there was a "question of compartment syndrome" and that "[t]his may very well be an impending compartment syndrome . . . ." According to the article, "[o]n diagnosis of impending . . . compartment syndrome, immediate measures must be taken," and "measuring compartment pressures is recommended" in questionable cases. Rodin testified at trial that he was certain that the plaintiff did not have compartment syndrome when he examined him that morning, and that his notation in the medical records merely reflected his concern that the plaintiff "was at risk for the development of compartment syndrome." The plaintiff claims that Rodin came up with this explanation about the meaning of his medical records only after reading the article, and that he should have been allowed to introduce the article and ask Rodin whether he reviewed it prior to his deposition to impeach his credibility on that issue. The plaintiff never argued at trial that the article was admissible for that purpose and we, therefore, will not consider it on appeal. *Travelers Ins. Co.* v. *Namerow*, 257 Conn. 812, 831, 778 A.2d 168 (2001) ("[o]ur review of evidentiary rulings made by the trial court is limited to the specific legal ground raised [at trial]" [internal quotation marks omitted]).

[19] In response to questioning from counsel for the plaintiff, Krasnick testified as follows:

"Q. . . . [D]o you subscribe to any medical journals or any other medical literature?

"A. Primarily two . . . the Journal of Bone and Joint Surgery and the Journal of the American Academy of Orthopaedic Surgery. . . .

"Q. And is the Journal [of the American Academy of Orthopaedic Surgery] generally used as a reference tool by orthopedic surgeons?

"A. All journals are used as reference tools by orthopedic surgeons.

"Q. Is the Journal of the American Academy of Orthopaedic Surgery used in that capacity as well?

"A. Absolutely.

"Q. And is that publication a standard authority in the field of orthopedic surgery?

"A. Yes."

[20] Before the plaintiff questioned Bazos on the article, the trial court initially indicated that the entire article would be admitted as a full exhibit. The defendants argued, however, that only the portions used for impeachment should be admitted, and the trial court responded, "[w]ell, I'm going to wait and see what [plaintiff's counsel] brings up on cross, it'll be marked in full and will not be published to the jury and then we'll . . . see what she brings out." At the conclusion of the plaintiff's cross-examination of Bazos, the defendants again inquired as to which portions of the article would be admitted as a full exhibit, and the trial court stated, "my ruling on what should and shouldn't come in is everything that [Bazos] was ques-

tioned on. . . . And I want you to work with [the plaintiff's] counsel on that, everything else is redacted." Consistent with the transcript, a review of the exhibits reveals that only the redacted version of the article was marked as a full exhibit. Thus, although the trial court's initial ruling may have suggested that the entire article would be admitted in full, the court ultimately admitted only the redacted version, and did so only after the plaintiff had completed his cross-examination of Bazos.

[21] For example, the plaintiff asked Bazos whether he agreed that "pain out of proportion to the injury aggravated by passive stretching of muscle groups in the corresponding compartment is one of the earliest and most sensitive clinical signs of compartment syndrome," and that "[p]eripheral pulses are palpable and, unless a major arterial injury is present, capillary refill is routinely present." This and other language used by the plaintiff in his questioning of Bazos is identical to that appearing in the article. See S. Olson & R. Glasgow, supra, 13 J. Am. Acad. Orthopaedic Surgeons 436.

[22] Specifically, although acknowledging that the plaintiff's counsel had asked Bazos at his deposition whether he "remember[ed] the names of any of the physicians for which [he had] given *deposition* testimony"; (emphasis added); the defendants explained that Bazos had responded that he only recalled testifying on behalf of Geiger because he mistakenly thought that the plaintiff's counsel was merely seeking to ascertain whether he had previously testified as an expert at trial, and Bazos had not previously testified at trial on behalf of Rodin. Counsel for the defendants also argued that Bazos' deposition testimony that he had not previously worked with or met Rodin was not false because, although he had served as an expert on Rodin's behalf, his relationship was with Rodin's counsel and her firm, rather than with Rodin himself.

[23] The dissent maintains that Bazos' previous relationship with Rodin was not collateral because it "was relevant to the issue of his potential bias or interest in the outcome of the case" and that "evidence tending to show a witness' bias, prejudice or interest is never collateral." (Internal quotation marks omitted.) To the extent the plaintiff preserved this claim at trial and has raised it on appeal, we disagree that the mere fact that an expert witness previously served as an expert on behalf of the same party in an unrelated matter is admissible to demonstrate bias. It is well established that, although a trial court may not unduly restrict a party from impeaching a witness with evidence of bias, the court maintains the discretion to limit the scope of such evidence when it is of limited probative value; see *State* v. *Lee*, 229 Conn. 60, 69–70, 640 A.2d 553 (1994); C. Tait & E. Prescott, supra, § 6.30.6 (b), p. 393; and to exclude relevant evidence that will result in unfair prejudice to the opposing party. Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice"); see also *Cousins* v. *Nelson*, 87 Conn. App. 611, 622–24, 866 A.2d 620 (2005). Thus, in addressing the identical issue in *Cousins*, the Appellate Court concluded that the trial court did not abuse its discretion in precluding the plaintiff from questioning the defendant's expert about other cases in which he had served as an expert on the defendant's behalf and, instead, limiting the plaintiff to asking whether the expert had a "personal relationship" with the defendant. (Internal quotation marks omitted.) *Cousins* v. *Nelson*, supra, 623–24. As the Appellate Court observed in that case, evidence that an expert witness previously served as an expert on behalf of the same party in an unrelated case "could not [reveal] any potential personal stake on the part of [the expert] in the outcome of the trial." Id., 623.

As in *Cousins*, the trial court in the present case did not completely bar the plaintiff from asking Bazos about his previous relationship with Rodin, but merely precluded him from asking Bazos whether he had worked as an expert for Rodin in other cases. It bears noting, moreover, that although the trial court indicated that the plaintiff could ask Bazos whether he had a "working relationship" with Rodin, the court also expressly informed the plaintiff's counsel that it was willing to consider other suggestions as to how the relationship could be described without alerting the jury to the other cases in which Rodin was named as a defendant. Of course, the plaintiff also was free to explore Bazos' potential bias in favor of Rodin by asking whether he was being compensated for his work in the present case. Testimony about previous cases, however, would have had little or no probative value and would have been extremely prejudicial to the defense because it would have revealed that Rodin had been a defendant in other medical malpractice actions. Thus, the trial court properly exercised its discretion in precluding this evidence to forestall the serious risk that the jury would conclude that Rodin likely was negligent in the present case

merely because he had been a defendant in other malpractice actions.

[24] For example, at the pretrial hearing on the defendants' motion in limine, in response to the defendants' argument that the plaintiff should not be permitted to question Bazos about his prior relationship with Rodin, the court explained: "It's not as if he's walking into this not knowing anything about [Rodin], he's had prior experience with [Rodin] on two previous occasions. And what I'm trying to get from you is a way counsel can bring out that there is this preexisting relationship between the parties . . . without going into what it was." The court further explained that "[t]he fact that there has been previous malpractice claims against [Rodin] is highly prejudicial and its prejudicial value outweighs is probative value. However, the plaintiff is entitled to bring out the fact that . . . there's some sort of relationship here between these parties, this is not someone who is blindly looking at [Rodin] for the first time." At trial, following the plaintiff's contention that asking Bazos about his work as an expert for Rodin in other cases was necessary to put the alleged false testimony in its proper context, the court responded, "you're going to be given an opportunity to attack his credibility on that issue, just not in the direction you want to take it on the other issues."

[25] The plaintiff's reliance on *Hayes* v. *Manchester Memorial Hospital*, 38 Conn. App. 471, 661 A.2d 123, cert. denied, 235 Conn. 922, 666 A.2d 1185 (1995), is misplaced. In *Hayes*, the Appellate Court concluded that the trial court had abused its discretion by precluding the plaintiff in a medical malpractice action from cross-examining the defendant's expert witness concerning an action pending against *the expert himself* that included claims of medical negligence similar to those at issue in *Hayes*. Id., 473–76. The Appellate Court reasoned that, because the allegations against the expert resembled the allegations against the defendant, the expert had a motive to testify that the defendant's actions conformed to the standard of care. Id., 473. *Hayes* is readily distinguishable because the plaintiff in that case sought to introduce evidence of other malpractice claims that had been filed against the defendant's expert, not against the defendant himself, and, therefore, there was no risk that the jury would presume that the defendant was negligent merely because he was a defendant in separate medical malpractice action.